CASEY (SEDGWICK v.). See Case No. 12,-610.

CASEY v. SOCIETE DE CREDIT MOBILIER. See Case No. 2,496.

CASH (HOUSE v.). See Case No. 6,736.

## Case No. 2,498.

CASH v. ONE THOUSAND TWO HUNDRED AND SEVENTY-SEVEN DOLLARS AND FIVE CENTS.

District Court, D. Florida. Feb., 1879.[1]

CONSORTSHIP — PROOF OF CHARACTER OF AGREEMENT—NATURE OF THE RELATION—TERMINATION—ACTION TO ENFORCE.

[1. Agreements of consortship by masters of vessels engaged in the business of. fishing, freighting. wrecking, or the like, unless limited by special understandings when made, are taken to be general, and to extend to all earnings by either vessel.]

[2. The burden of proving the restricted character of the agreement rests upon the party alleging it.]

[3. The special intention or understanding of either party as to the character of the agreement will not control its operation. unless expressed when the agreement is made.]

[4. Such an agreement is for and on account of the vessels, although made by the masters thereof.]

[5. In the absence of a stipulation as to the determination of such an agreement. it can only be terminated by voluntary dissolution and notice.]

[6. While, by the character of the vessel or the agreement. its interest in the consortship may be small. this will never be presumed, but the general principle that the interests of the vessel control will govern.]

[7. The change of owners, master. or crew of one vessel without notice to the other parties cannot affect the consortship.]

[8. Persons joining or becoming interested in a vessel during an agreement of consortship enter upon the relation, and assume the risk of profit or loss.]

[9. On libel to enforce an agreement of consortship, the question being one of consider-

[1] [Published. by permission. from the MSS. of Hon. James W. Locke, District Judge.]

able interest to the community, and the court being unable to say that respondent's refusal to pay, thus compelling a resort to the court, was wrong under the circumstances. he should not be charged with the costs. but the same should be ordered paid from the fund in controversy.]

[In admiralty. Libel by W. D. Cash and others against $1,277.05, and F. J. Moreno.]

W. C. Maloney, Jr., for libellant.

G. Browne Patterson and L. W. Bethel, for respondent.

LOCKE, District Judge. This is a cause to enforce the division of an amount earned and received by the schooner Florida for services rendered the Spanish steamer Garcia, under an alleged agreement of consortship made and entered into by the master of that vessel with the master of the schooner California in December last, for an equal division of the earnings of those two vessels. Such agreements are frequent in this district, and are generally intended to relate more particularly to the business of wrecking. but at other times, where no limits are expressed in making the agreement, extend to all earnings from whatever source. In this case the consortship was general, as money earned by the California from fishing, freight, and passage money had been divided with the Florida; and it is admitted that it was such as would include earnings from salvage service. It was also indefinite and undetermined in time. Such agreements of consortship. unless limited by special understandings when made, are taken to be general, and extend to all such amounts as may be earned by either vessel. They may be restricted as closely as the parties making may desire and express at the time, but the burden of proving such restricted character of the agreement rests upon him alleging it; and, unless it is shown that such restriction is expressed at the time of making, any special attention or understanding of either party cannot be accepted as controlling or influencing its operation. Such a consortship is for and on account of the vessels. although made by the masters. In all maritime matters. agreements of affreightment, charter parties. contracts for insurance, supplies or repairs or other maritime nature, they are presumed to be made for and on account of the vessel and those connected with her, and not on account of master or crew. The vessel is the object, and all relations existing between the parties are through her.

The supreme court, in Andrews v. Wall, 3 How. [44 U. S.] 568. in speaking of a consortship of this nature, says: "Although made by the master of the vessel, it must be deemed to be made on behalf of the owners and crews. and to be obligatory on both sides until formally dissolved by the owners. The mere change of masters would not dissolve it, since it is not a contract for the personal benefit of themselves, or for any particu-

lar service. It falls precisely within the same rule, as to its obligative force, as the contract of the master of a ship for seaman's wages, which, if within the scope of his authority, binds the owner, and is not dissolved by the death or removal of the master. Besides, the agreement or stipulation for consortship was for an indefinite period, and consequently could not be broken up or dissolved, only upon due notice to the adverse party; and the mere removal of the master of one of the vessels, by the owner thereof, for his own benefit, or at his own option, could in no manner operate without such notice, to the injury of the others." This, then, is the general controlling principle in such consortships, namely, that it is through the vessels that the interests are united, and through them alone, and unless it has been stipulated and agreed between the parties that some other circumstances shall terminate the contract, voluntary dissolution and notice, alone, can. It may be true that frequently the character of the vessel, or the agreement with master and crew, is such that her interest in the consortship is but small when compared with theirs; but this can never be presumed, and the general principle that the interests of the vessel control still governs. The change of owners cannot injuriously affect the interest of seamen, nor can a change of master or crew affect a contract of affreightment or charter party made on account of the vessel, unless it has been particularly specified that it should. The change of owners of one vessel without notice to the other parties could not affect the consortship, nor could the change of master or crew. The supreme court says plainly that the removal of a master could not, and, if not the master, certainly not the crew. Whoever joins a vessel, or becomes in any way interested in her, during the existence of a contract consortship, enters upon such relation with the burden of such agreement, and takes the risk, whether he makes or loses. If not so, neither party could be certain of his relations with his consort, and his movements are liable to be interfered with, and loss incurred. These being the principles upon which such contracts can alone exist in equity to those engaged or interested in them, let us apply them to the cause under consideration; for, in applying principles, neither questions of amount nor persons can be considered.

The first point of defense is that the consortship was made with Roberts, the former master of the California, and not with Albury, who was master at the time of earning the money in question; nor on account of her owner; and that the entire crew had been changed, and none of them had been the parties consorted with, or that the present crew shipped with the understanding that they were consorted. This point is answered by the decision of the supreme court, and embodies only question of law, namely, the construction to be placed upon such contract, and does not depend at all upon the opinion of the party making, as it does not appear that there was any material expression of opinion varying the general construction. The new crew, it appears, were informed of the consortship, but their opinion whether they were bound by it or not could have been taken in their favor, had the suit been against them for a share in the earnings of their vessel, and it would not be fair to consider them in the present case. They joined the vessel under the circumstances of the consortship, of which they were aware, and are bound by the legal construction of it. Demerritt, the respondent, states that he would not have consorted with Albury, but did consort with Roberts, on account of his skill and knowledge of fishing. There was no expression of this idea at the time of making the agreement, and no stipulation that it should be terminated by a change of masters. Demerritt could have protected himself and his owners by such an understanding at the time of the contract, the same as an insurer can stipulate against a change of masters without notice and consent; but where such a matter is not mentioned it can have no force.

In further defence, it is urged that the understanding was that both vessels should fish up the reef until they met at Cape Florida, when one vessel should take all of the fish, and proceed to Havana, but that the California, instead of following this course, went on a salvage cruise in search of floating cotton which was reported adrift in the Gulf Stream. Now, were it shown that this was a condition precedent, or a part of the agreement of consortship, and that at the time both parties understood it so, it would have much force; but I do not find that to have been the case. It nowhere appears that it was understood to be a part of the contract of consortship that they should fish, if more profitable business offered, but that this was an understanding outside of, and separate from, the original agreement, and subservient to circumstances which might offer opportunities for profit or gain. Now, was there any misconduct or bad faith in the owner, master, or crew of the California in discharging their first crew, or going on a wrecking voyage, which should prevent them in justice from claiming in this matter, although the contract might have been virtually terminated? If it had been shown that the crew of the California had been discharged, and she left any length of time doing nothing, but looking to her consort for earnings, the matter might well be urged; but that does not appear to have been the case. Before Roberts left, he had engaged Albury as master, a crew was shipped, and she went to sea very soon. A temporary delay in the change of crews could cause no more injury to respondent than would the vessel's lying idle a few hours, the same length of time, with

crew on shore. In regard to the California's going for cotton, had all parties interested been consulted at the time, 1 am satisfied the consort would have been unanimous, as under the circumstances such a voyage promised a greater profit than would one for purpose of fishing alone, and therefore I do not consider her voyage improper. Had she fallen in with a large amount of cotton, the Florida would certainly have been entitled to a portion of the salvage. Demerritt had an opportunity, when the vessels met at Roderiquez, to terminate the consortship, and in not doing so assumed the risk of meeting a vessel in distress himself, or sharing with Albury if he fell in with one. The question has been asked, to whom should the money go, if awarded? We may also ask from whom would money have been claimed had the California, instead of the Florida, fallen in with the Garcia. Not from those individually with whom the consort was made, but those who had accepted the relation previously occupied by them, and taken the chances either to share their earnings with the Florida and her crew, or take a share from them. This is a question which is of considerable interest to this community, and I cannot say that I consider the respondents so far in the wrong in refusing the payment, and compelling a resort to the courts for a judicial decision, as to justify charging the entire costs to them.

It is therefore ordered that the costs be paid from the total amount, and the libellants receive one-half the net residue.